UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| JEAN REGIS and VERLANDE REGIS, on their own behalf and on behalf of their minor children, M, J, and H,<br><br>Plaintiffs,<br><br>v.<br><br>WILLIAM GROSS, WILLIAM FEENEY, MATTHEW PIEROWAY, JOHN DOES 1-10, and THE CITY OF BOSTON,<br><br>Defendants. | Civil Action No. 19-10527<br><br>**AMENDED COMPLAINT** |

## INTRODUCTION

Plaintiffs Jean and Verlande Regis, on their own behalf and on behalf of their minor children, M, J, and H, by and through their undersigned counsel, respectfully file this action against defendants William Gross, William Feeney, Matthew Pieroway, John Does 1 through 10, and the City of Boston. Plaintiffs allege as follows:

1. In the early morning of November 27, 2018, while the members of the Regis family were still in bed, defendants William Feeney, Matthew Pieroway, and other officers of the Boston Police Department, without first knocking and announcing their presence, forcibly entered the Regis family's home using a battering ram; awoke some members of the family from a deep sleep; forced family members to the floor and up against a wall at gunpoint; stepped on and injured Verlande's hand; and handcuffed Jean and Verlande Regis, and their minor daughter M, all in front of their two youngest children, J and H. City police officials later admitted that there was no lawful basis for the entry into the Regis home.

## JURISDICTION

2. This action includes claims under 42 U.S.C. § 1983 and § 1988, and the Fourth and Fourteenth Amendments to the United Constitution. This Court thus has subject matter jurisdiction pursuant to 28 U.S.C. § 1331. This Court has jurisdiction over the claims for declaratory relief pursuant to 28 U.S.C. §§ 2201-2202. This Court has subject matter jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

## PARTIES

3. Plaintiffs Jean and Verlande Regis are individuals who, at all times relevant to this complaint, were residents of Suffolk County, Massachusetts.

4. M, J, and H are minors, represented here by Jean and Verlande, their parents.

5. William Gross is the Commissioner of the Police Department of the City of Boston. He is responsible for all operations of the Boston Police Department. He is sued in his official capacity.

6. On information and belief, defendant Feeney was at all times relevant to this complaint a duly appointed police officer of the Boston Police Department. His actions alleged in this complaint were taken under color of the laws of the Commonwealth of Massachusetts and the City of Boston. He is sued in his individual capacity.

7. On information and belief, defendant Pieroway was at all times relevant to this complaint a duly appointed police officer of the Boston Police Department. His actions alleged in this complaint were taken under color of the laws of the Commonwealth of Massachusetts and the City of Boston. He is sued in his individual capacity.

8. On information and belief, defendants John Does 1-10 were at all times relevant to this complaint duly appointed police officers of the City of Boston Police Department. Their

actions alleged in this complaint were taken under color of the laws of the Commonwealth of Massachusetts and the City of Boston. They are sued in their respective individual capacities. Fictitious names are used for purposes of this complaint as the plaintiffs do not yet know the identities of these defendants, but expect to learn them through discovery in this action.

9.   Defendant City of Boston is a duly organized municipal corporation under the laws of the Commonwealth of Massachusetts.

## FACTS

10.   On November 27, 2018, Jean and Verlande were living at 41 Faneuil St., Apartment 138 in Brighton, with their three minor children M (age 15), J (age 5), and H (age 4). 41 Faneuil St. is a multi-unit apartment building.

11.   Around 4:30 am on that day, while the family was still in bed, a Drug Control Unit, under the supervision of defendant Feeney, arrived at 41 Faneuil St., a public housing complex where many families live, to execute a "no-knock" warrant for a different apartment within the building.

12.   The Regis family was startled and awakened by a loud crashing noise caused by members of a Special Weapons and Tactics ("S.W.A.T.") team breaking down the front door to their apartment with a battering ram. The officers did not knock and announce their presence and purpose prior to breaking open the Regis family's door and raiding their home. City records reflect that the entry was made at the direction of defendant Pieroway.

13.   Approximately 10 to 12 officers forced their way into the Regis family's apartment, using force and without consent. The officers began raiding every room in the apartment, including closets.

14. Verlande leapt from her bed upon hearing the crash from the door being forcibly broken down. Upon entering the apartment, the officers pointed a firearm at Verlande, pushed her to the ground, and handcuffed her as she lay partly in the apartment's hallway and partly in the bedroom. As she lay on the ground prior to handcuffing, several officers stepped on and injured her hand.

15. An officer then pointed a firearm at Jean as he lay in bed, ordered him out of bed, pressed him against the wall with his hands behind his back, and handcuffed him. Jean asked why he was being handcuffed, and the officer told Jean that there was a warrant to search his apartment. This explanation was false.

16. Jean and Verlande immediately complied with all instructions the officers gave and did not resist the officers in any way. They provided their names when asked – names that did not match the name of the target of the raid.

17. Meanwhile, M woke when she heard Verlande scream. M attempted to open her bedroom door and enter the hallway, but was immediately shoved back into her room by an officer wielding his shield and using it to push her back.

18. The officer aimed his drawn gun at M. The officer ordered M to the floor and to put her hands behind her back. M complied immediately. M told the officer handcuffing her that she did not know what was going on and that she was only 15 years old. The officer nonetheless kept her in handcuffs on the floor.

19. Jean, Verlande, and M were kept in handcuffs for approximately 20 minutes. Jean and Verlande were restrained and handcuffed in front of their youngest two children, five-year-old J and four-year-old H, who had been sleeping in their parents' bed and thus were present in

their parents' bedroom when the police raided the apartment. With the children present, officers openly discussed plans to remove the children from the premises and place them in foster care.

20.     The force used by the officers, including forcing Verlande to the ground and stepping on her repeatedly; shoving M; pointing firearms at the family members, including 15-year-old M; forcing Jean against a wall; and handcuffing Jean, Verlande, and M, in front of J and H, was objectively unreasonable, particularly given that there was no warrant authorizing entry to the apartment, that no member of the family in any way resisted the officers' initial show of force, and that their names and descriptions did not match the target of the raid. The entry and force used were also unreasonable because, upon information and belief, including later statements by some of the police officers, the officers had been given a key to the correct apartment, but, when it did not work on the Regis family's door, they did not re-evaluate whether they were at the correct apartment, but instead broke down the door using the battering ram.

21.     The officers entered every room in the apartment, ransacking closets and searching the entire apartment.

22.     After approximately 20 minutes, one of the officers, on information and belief defendant Feeney, told the family and the other officers that they had entered the wrong apartment. The search warrant possessed by the officers listed a different apartment number than the number on the Regis family's apartment. The affidavit that gave rise to that warrant repeatedly stated the apartment number of the raid's actual target, which was not the Regis family's apartment number.

23.     From the standpoint of a reasonable officer, no circumstances existed that rendered announcement unreasonable or a threat to officer safety or that justified use of the S.W.A.T. team. In fact, when the officers later approached the correct apartment after realizing

they had no warrant to enter and search the Regis family's home, they knocked on the door to gain entry. No weapons or drugs were found once the search was conducted of the correct apartment.

24. The apartments in the building were clearly and obviously labeled with apartment numbers on the outside of the apartment doors. In addition, one officer told Jean that the team was given instructions to enter the first apartment on the *right* when entering the floor. The Regis family's apartment, however, was the first apartment on the *left*.

25. The defendants' conduct violated the Regis family's clearly established rights, including rights protected by the Fourth and Fourteenth Amendments to the Constitution of the United States.

26. The defendants made a warrantless no-knock entry into the Regis family's apartment using a S.W.A.T. team and failed to take reasonable precautions to avoid violating the Regis family's rights, such as following the directions provided to them for locating the correct apartment, reading the number on the Regis family's apartment door, confirming the name of the parties subject to the search, or double-checking that they had the right apartment before using a battering ram when the key they were provided did not work. The affidavit that led to the issuance of a warrant for the intended apartment noted that the apartment number was clearly marked on the apartment door. The Regis family's apartment was similarly marked clearly, but with a different number than the apartment number on the warrant.

27. After entering the wrong apartment, all officers failed to notice indications that they continued to be in the wrong apartment – such as the existence of small children; the fact that the individuals' surnames, which they provided upon request, are all "Regis"; and the fact that none of the occupants matched the description of the intended target set forth in the search

warrant affidavit ("Hispanic male, 24 years of age, with short black hair, weighing approximately 160 pounds, standing approximately 5'-10" in height."). Furthermore, the search warrant affidavit made clear that defendant Pieroway, and other members of the drug control unit that initiated the raid and that were involved in the case, were familiar with the intended target and had even been to the targeted apartment, thus making the entry into the Regis family's home and the treatment of the Regis family, in a different apartment and in the clear absence of the intended target, even more unreasonable. Each of the officers present failed to prevent the other officers from taking the actions described herein, despite knowing, or having reason to know, that the officers were violating the Regis family's constitutional rights.

28.  The Boston Police Department, through its Commissioner William Gross, has admitted that the officers had no lawful basis for entering the Regis family's home.

29.  As a result of the defendants' actions, the plaintiffs have suffered and continue to suffer injury and harm. The plaintiffs have suffered substantial emotional trauma from this incident. M has missed school as a result of her trauma. Verlande has missed work. Jean suffers anxiety and has ongoing feelings of not having been able to protect his family. Verlande and M have suffered headaches from the distress that defendants' actions caused. Verlande's hand sustained injuries due to the officers repeatedly stepping on her hand. J and H continue to ask their parents if the police are coming to get them and if their parents are "bad guys," and frequently hide under the bed "from the police." Since the incident, J has suffered from nightmares, and his parents have noticed behavioral problems that manifested themselves after this incident. Jean and Verlande have suffered from paranoia as a result of the raid. All family members continue to exhibit signs of emotional and psychological trauma and stress. All family

members suffer from anxiety due to the incident, and all family members are now scared of interactions with the police.

30. On December 27, 2018, plaintiffs, through counsel, sent a public records request to the City of Boston's Police Department asking for records showing, among other things, training provided to police officers, and policies, practices, and procedures, with regard to the execution of no-knock warrants. After no response was received within the 10 business days required by M.G.L. c. 66, § 10, counsel for plaintiffs filed an appeal to the Supervisor of Public Records within the Secretary of the Commonwealth's office. On February 22, 2019, the Supervisor of Records issued a ruling that the City had failed to comply with the public records law and ordered that a response be provided within another 10 business days. The City failed to comply within the required 10 days.

31. Only after the plaintiffs filed this action, seeking, *inter alia*, relief under the Public Records Law, did the City then finally produce some, but not all, of the requested documents, causing unreasonable delay and expense in receiving the public records.

32. The City and its Police Commissioner are aware that officers, including S.W.A.T. teams, may make entry into housing units for which there is not a valid warrant and that great harm can result from such entries. Indeed, defendant Gross told the Regis family that entries into the wrong homes have happened in the past and that one victim suffered a heart attack and died as a result. Upon information and belief, Reverend Accelyne Williams died from a heart attack due to a mistaken apartment raid. Similar raids of the wrong home have occurred throughout the country and have been widely publicized. Despite City policymakers' obvious awareness of such risks, including awareness from the actual death of a victim in such a situation, the City has failed to adopt reasonable policies designed to ensure that the correct home is entered when no-

knock warrants are used. Based on the contents of the City's belated production of documents to the plaintiffs, it is clear that the City lacks policies and has failed to provide sufficient training designed to ensure that those participating in a no-knock warrant compare the address on the warrant to the address of the home being invaded, and otherwise take steps to ensure the correct apartment is being raided, before making entry.

      33.      Rule 334 of the Boston Police Department's own Rules and Procedures states that "In the unlikely event that the supervisor determines that the wrong premises have been entered, the search shall immediately terminate." In spite of this awareness, the Rule contains no guidance to entering officers to ensure that the wrong premises are *not* entered in the first place, other than the requirement that "the affiant police officer shall point out to entry personnel the particular unit to be entered and searched." Notwithstanding this written recognition of the importance of the affiant pointing out the correct unit in a multi-unit building, according a Police Department "source," the City has adopted a policy of not permitting the affiant to be present when S.W.A.T. teams are used or when guns are expected, thus eliminating by policy even the one, minimal precaution the Police Department's Rule imposes as to the correctness of the address being raided. Materials the City has produced in response to the public records request corroborate that the City has adopted such a policy of not allowing the affiant to be present in such situations.

      34.      Nowhere in the search warrant execution procedures in Rule 334, or in any other policy, is there any requirement that, prior to entry, the officers, for example, compare the names of the individuals subject to the search warrant with the names of the individuals residing in the apartment they plan to enter, or double check and compare the address on the warrant to the actual address of the housing unit before forcibly entering with a battering ram. Nowhere in the

search warrant policy is there any requirement that the S.W.A.T. team do a second survey of the unit to be searched prior to the day of the search or designate a secondary validator to identify the unit, particularly but not only if the affiant will not be present. And nowhere in the policies is there any requirement promptly to compare the names and physical features of the persons in the unit entered with the name and described features of the search warrant target. This failure to adopt adequate policies and to train constitutes deliberate indifference.

     35.     Upon information and belief, the City and its Police Commissioner do not provide training or supervision to officers concerning the importance of preventing trauma to children by using trauma-sensitive approaches to raids that occur in vicinities where children are likely to be present. During the raid into the Regis family's home, guns were pointed at a child and at the children's parents in front of them. Cooperating parents were handcuffed in the presence of young children. The officers discussed openly, in front of the five-year-old and four-year-old children, what the officers "would do with the kids," saying "we're going to take them with us" and "they are going to foster care." The officers pointed a gun at Verlande, forced her to the floor, stepped on her, and handcuffed her, all in front of J and H. The officers also pointed firearms at Jean, pressed Jean against a wall, and handcuffed Jean, all in front of J and H. The officers pointed a firearm at 15-year-old M, used a shield to shove her back into her bedroom, forced her to the floor, and handcuffed her.

     36.     As obviously unreasonable and excessive as this conduct was, there is no City policy to prevent it. The City has adopted no policies and, on information and belief, has provided no training to its officers, on how to avoid such treatment of children. Indeed, based on the District Attorney report following the death of Reverend Williams due to a wrong home raid, the Department used to have a written policy stating that "Some women, children, and the

elderly will not be placed on the floor and cuffed behind their backs unless they become unruly or interfere with the neutralization of the scene." On information and belief, including the City having produced no such policy in response to the public records request, the City has since made a policy decision to abandon such caution. This failure to have any adequate policy concerning the use of force on and in the presence of children directly encouraged, authorized, and caused the officers' conduct toward M, J, and H.

37. Similarly, the City has adopted no policy, and has not provided training, designed to avoid using or seeking no-knock warrants at times when young children are likely to be present, even in locations where they could reasonably be expected, such as housing complexes occupied by many families. The City's rules for executing warrants do not require officers to avoid using unnecessary force against or in the presence of children whenever possible. Nor do the City's policies on obtaining and executing warrants require those seeking or executing them to make efforts to determine (such as by surveillance) whether children live in the home or building, or the times when the presence of children might be avoided.

38. The City's and Commissioner's affirmative policy choices, along with the failure to impose requirements and to train officers to avoid unnecessary or excessive use of force and trauma against and in the presence of children, constitute deliberate indifference to the harm such conduct causes.

## CAUSES OF ACTION

### COUNT I - 42 U.S.C. §§ 1983 and 1988
(Against Defendants Feeney, Pieroway, and Does)

39. Plaintiffs repeat and re-allege paragraphs 1-38 of this complaint.

40. The actions of defendants, taken under color of state law, violated plaintiffs' rights to be free from unreasonable intrusions into their home, unreasonable seizures, and

11

unreasonable and excessive force, as guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution.

41. As a result of the above-described violations of their rights, plaintiffs suffered harm.

## COUNT II - 42 U.S.C. §§ 1983 and 1988
(Against the City of Boston and Defendant Gross)

42. Plaintiffs repeat and re-allege paragraphs 1-41 of this complaint.

43. The City of Boston and Defendant Gross have adopted policies that caused the wrongful entry into the Regis home, including but not limited to the policy of not allowing an affiant to be in a location to point to the exact unit when a S.W.A.T. team is being used, thereby removing the sole protection otherwise in its polices. In addition, they did not require or provide appropriate supervision and training of their officers, and have not adopted proper policies and practices, to avoid entries into the wrong homes and/or to cause them to cease invasions into the wrong homes at the earliest opportunities. Supervision, training, and policies that apparently are absent include, but are to limited to, a policy explaining what should be done to identify the correct unit when the affiant will not be present, including a policy requiring a secondary verifier of the target residence; a policy that an officer actually executing the no-knock warrant double-check the address on the warrant against clearly marked addresses at the location; and a policy requiring those executing the warrant to be on alert for other indicia that they may be on the verge of executing, or have executed, the warrant at the wrong home.

44. The City of Boston and Defendant Gross have adopted policies that caused the use of excessive force in this case, including the apparent abandonment of the former policy of not handcuffing cooperative search targets and adjusting procedures around children and the elderly. In addition, they did not require or provide appropriate training or supervision, and have

not adopted proper policies and practices, to avoid excessive force once entry into a home has occurred. Supervision, training, and policies that are absent include but are not limited to a policy restricting use of S.W.A.T. teams in locations where children may be present; a policy of not pointing guns at or using handcuffs on children and others unless they fail to cooperate; a policy requiring officers to be vigilant for and act on indicia that they may be in the wrong home; and policies around not questioning adults in the presence of children and not threatening in the presence of the children to put them in foster care. The officers' use of excessive force against the Regis family, including against and in the presence of minor children M, J, and H, was directly and proximately caused by lack of sufficient policies and training designed to avoid entry into homes other than those that are the intended and identified targets of warrants, or unnecessary or excessive use of force, including against and in the presence of young children. The City's lack of current and relevant policies to protect victims of such improper raids and to protect children from unnecessary officer use of force have resulted in a City policy and practice of using such unnecessary and unreasonable force.

45. Deliberate indifference on the part of City policymakers, including Defendant Gross, to both patterns of similar events and obvious gaps in Department policies led to the failure to supervise properly and train the officers involved, and thus were the cause of the violations of plaintiffs' rights alleged herein.

46. As a result of the above-described violations of their rights, plaintiffs suffered harm.

### COUNT III - VIOLATION OF M.G.L. c. 12, §§ 11H and 11I
(Against all Defendants)

47.     Plaintiffs repeat and re-allege paragraphs 1-46 of this complaint.

48.     The actions of defendants constituted threats, intimidation, or coercion that interfered with plaintiffs' exercise and enjoyment of rights secured by the Constitutions and laws of the United States and the Commonwealth of Massachusetts, including but not limited to the rights secured by the Fourth and Fourteenth Amendments to the United States Constitution and Article XIV of the Declaration of Rights of the Massachusetts Constitution.

49.     As a result of the above-described violations of their rights, plaintiffs suffered harm.

### COUNT IV – VIOLATION OF M.G.L. c. 66, § 10A
(Against the City of Boston)

50.     Plaintiffs repeat and re-allege paragraphs 1-49 of this complaint.

51.     Defendant City of Boston provided only some of the requested records that the Regis family properly sought. For example, at least one officer involved in the raid was equipped with a camera during the raid. The City did not, however, provide any audio or video files when making its belated production. In addition, the City failed to produce the investigative reports created by the Police Department and the District Attorney's office after Reverend Williams's death due to a wrong-home raid. Therefore, the months' long delay, which led to only a partial production and only after the Regis family sued the City under the Public Records Law, constitutes unreasonable delay per Massachusetts Public Records Law, G.L. c. 66, § 10(a).

52.     Defendant City of Boston failed and has continued to fail to comply with its obligations under the Massachusetts Public Records Law, G.L. c. 66, § 10. As such, Plaintiffs are entitled to declaratory and injunctive relief and attorneys' fees pursuant to G.L. c. 66, § 10(a).

## COUNT V - ASSAULT AND BATTERY
(Against Defendants Feeney, Pieroway, and Does)

53. Plaintiffs repeat and re-allege paragraphs 1-52 of this complaint.

54. The actions of the individual defendants constituted an assault and battery.

55. As a result of the assault and battery, plaintiffs suffered harm.

## COUNT VI - FALSE ARREST AND IMPRISONMENT
(Against Defendants Feeney, Pieroway, and Does)

56. Plaintiffs repeat and re-allege paragraphs 1-55 of this complaint.

57. The actions by defendants constituted a false arrest and false imprisonment.

58. As a result of the false arrest and imprisonment, plaintiffs suffered harm.

## PRAYERS FOR RELIEF

**WHEREFORE**, plaintiffs respectfully request entry of judgment in their favor and against the defendants, containing the following relief:

A. Awarding plaintiffs compensatory damages;

B. Awarding plaintiffs punitive damages;

C. Issuing an injunction prohibiting the City, the Commissioner, and Boston Police officers from engaging in the unlawful behavior described herein and requiring the City and the Commissioner to adopt policies to reduce the likelihood that such unlawful behavior will happen again;

D. Declaring that the City of Boston and the Commissioner have failed to take appropriate steps to ensure that Boston Police officers, in executing a search warrant, do not enter the wrong housing unit;

E. Declaring that the City of Boston and the Commissioner have failed to take appropriate steps to ensure that Boston Police officers, in executing a search warrant, take prompt steps to evaluate whether they are in the correct residence so they can terminate a search in the wrong location as soon as possible;

F. Declaring that the City of Boston and the Commissioner have failed to take appropriate steps to ensure that Boston Police officers avoid the unnecessary or excessive use of force against targets of search warrants who comply with all commands of those conducting a raid;

15

      G.      Declaring that the City of Boston and the Commissioner have failed to take appropriate steps to ensure that Boston Police officers are trained to and in fact do avoid the unnecessary or excessive use of force against and in the presence of children;

      H.      Awarding plaintiffs the costs of this action, including reasonable attorneys' fees;

      I.      Awarding plaintiffs pre- and post-judgment interest as permitted by law; and

      J.      Awarding such other further relief as this Court may deem necessary and appropriate.

## **JURY DEMAND**

A trial by jury is hereby demanded on all claims.

May 23, 2019

                Respectfully submitted,

                JEAN REGIS and
                VERLANDE REGIS,

                By their attorneys,
                /s/ Joshua L. Solomon
                Joshua L. Solomon (BBO #657761 )
                Lauren A. Riddle (BBO #703859 )
                POLLACK SOLOMON DUFFY LLP
                101 Huntington Avenue, Suite 530
                Boston MA 02199
                Tel:(617) 439-9800
                jsolomon@psdfirm.com

                Ruth Bourquin (BBO #552985 )
                American Civil Liberties Union Foundation of
                Massachusetts, Inc.
                211 Congress Street
                Boston MA 02110
                Tel: (617) 482-3170
                rbourquin@aclum.org

## Certificate of Service

The undersigned certifies that this document, filed through the ECF system, will be electronically served on counsel who are registered users of ECF May 23, 2019.

/s/ Joshua L. Solomon